**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **H. KENNETH LEFOLDT, JR., IN HIS CAPACITY AS TRUSTEE FOR THE COPSYNC LIQUIDATION TRUST** <br>      **Plaintiff** | **CIV. ACTION. No. 19-10082** <br><br> **SECTION T (4)** |
| **V.** | **JUDGE GREG GERARD GUIDRY** |
| **RONALD A. WOESSNER, ALYSSA KIRK, JOSEPH R. ALOSA, SR., J. SHANE RAPP, JOEL HOCHBERG, RUSSELL D. CHANEY, ROBERT L. HARRIS, BRIAN K. TUSKAN, WARD LEBER, BRAD POWERS, LUISA INGARGIOLA, BARRY W. WILSON, PHILLIP ANDERSON, XL SPECIALTY INSURANCE COMPANY, HCC SPECIALTY INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, AND BERKLEY INSURANCE COMPANY** <br>      **Defendants** | **MAG. JUDGE KAREN WELLS ROBY** <br><br> **JURY DEMAND** |

## FIRST AMENDED COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, H. Kenneth Lefoldt,

Jr., ("Lefoldt," "Plaintiff," or "Trustee") in his capacity as Trustee of the COPsync, Inc.

Liquidation Trust created pursuant to the Plan of Liquidation confirmed by the United States

Bankruptcy Court for the Eastern District of Louisiana in the case bearing the caption *In re*

*COPsync, Inc.*, Case No. 17-12625 (the "Bankruptcy Case"), and files this Complaint (the

"Complaint") against Defendants, Ronald A. Woessner, Alyssa Kirk, Joseph R. Alosa, Sr., J.

Shane Rapp, Joel Hochberg, Russell D. Chaney, Robert L. Harris, Brian K. Tuskan, Ward Leber,

Brad Powers, Luisa Ingargiola, Barry W. Wilson, Phillip Anderson, Federal Insurance Company,

Berkley Insurance Company, XL Specialty Insurance Company, and HCC Specialty Insurance

Company, seeking compensatory damages arising out of the Defendants' breaches of fiduciary

and other legal duties and gross negligence as officers and directors of COPsync, Inc. ("COPsync"

1

or the "Company"), all of which occurred on or after November 18, 2015.  The Trustee avers upon information and belief as follows:

## INTRODUCTION

1.      In November 2015, COPsync closed a $10.5 million public offering as part of a strategy to get up-listed to NASDAQ.  The proceeds should have funded several years of product development and operations.  Instead, within a few months and as a result of Defendants' gross mismanagement and self-dealing, COPsync was nearly insolvent and in danger of being de-listed by NASDAQ.  By mid-2017, COPsync was insolvent.  This action seeks to recover the damages caused by Defendants' misconduct.

2.      COPsync was founded in 2005 to develop and market software to address a problem that vexes public safety officers.  The Company's primary product, the COPsync Network, allowed public agencies to communicate across agencies in real time.  The COPsync Network was well received by potential public safety clients.

3.      COPsync had difficulty executing and delivering products with the stability and functionality that the Company promised and that its consumers required.  Compounding the gap between COPsync promised products and delivery, the Company also promoted additional features that were purportedly under development.

4.      Although customers were promised that those additional features would be available not long after purchase, the Company required capital to complete the research and development required to resolve technical problems with both the COPsync Network and the additional products.  In the fall of 2015, the Company closed a $10.6 million public offering that provided a significant infusion of much needed capital and allowed it to be listed on NASDAQ.

2

5.    Although the proceeds of the public offering should have funded years of the Company's operations and met its research-and-development needs, the Defendants embarked on a reckless and irrational spending spree, wasting all of the public offering funds and millions of dollars more in a matter of months.   Among other irrational and outlandish expenditures, Defendants approved exorbitant pay raises and bonuses for COPsync's executives, paid for luxury apartments in Texas and New York, entered into expensive and vague consulting contracts which did not benefit the Company, and lined their own pockets with Company funds.   Defendants did not allocate any meaningful portion of the proceeds to research and development.

6.    Ten months after the $10.5 million public offering, COPsync had less than $400,000 in cash on hand and risked being de-listed from NASDAQ.   By the time the Company filed for bankruptcy protection a year later, it had been de-listed from NASDAQ and held a scant $53,000 in cash with liabilities well in excess of $17 million.   The Defendants' gross mismanagement, self-dealing, and greed reduced COPsync from a company valued by the investing public at more than $25 million to an insolvent shell.   This suit seeks to hold the Defendants responsible for their breaches of fiduciary duty and gross negligence following the public offering which caused COPsync's financial implosion.

## JURISDICTION AND VENUE

7.    Prior to its liquidation, COPsync was a corporation organized and existing under the laws of the State of Delaware and its principal place of business in the State of Louisiana.

8.    Lefoldt is a citizen of the State of Mississippi, but when suing in his capacity as Trustee, he is deemed to be a citizen of the same states as COPsync.

9.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332, as the Plaintiff is deemed a citizen of the State of Delaware and Louisiana, each

1470203v.1

Defendant is a citizen of states other than Delaware and Louisiana, and the amount in controversy exceeds $75,000.

10.     This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), as this proceeding is related to the Bankruptcy Case and the Plan of Liquidation confirmed therein.

11.     This Court may exercise personal jurisdiction over Defendants Woessner, Kirk, Alosa, Rapp, Chaney, and Wilson because they have submitted to the jurisdiction of this Court by filing proofs of claim in the Bankruptcy Case.

12.     This Court also may exercise personal jurisdiction over each of the Defendants pursuant to Federal Rule of Bankruptcy Procedure 7004(d), made applicable through this Court's § 1334(b) "related to" bankruptcy jurisdiction.

13.     Venue of this proceeding in this district is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and 1409.

## PROCEDURAL HISTORY

14.     On September 27, 2017 (the "Petition Date"), the Company filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code initiating the Bankruptcy Case before the United States Bankruptcy Court for the Eastern District of Louisiana (the "Bankruptcy Court").

15.     Prior to the Petition Date and continuing through the date hereof, COPsync was insolvent from a balance sheet standpoint with liabilities exceeding the fair market value of assets by more than $17 million.

16.     COPsync was unable to reorganize as a going concern and sold its principal assets in an auction conducted by the Bankruptcy Court.  Thereafter, COPsync proposed to liquidate and

4

transfer its remaining assets—principally a promissory note given by the buyer of the assets and several legal claims and causes of action—to a liquidating trust.

17.     On September 21, 2018, the Bankruptcy Court entered an order (the "Confirmation Order") confirming the Third Amended Plan of Liquidation pursuant to Chapter 11 of the U.S. Bankruptcy Code Immaterially Modified as of September 13, 2018 (the "Plan"). The Liquidation Trust was established by and became effective following entry of the Confirmation Order [ECF Doc. 322].

## PARTIES

18.     Pursuant to the Confirmation Order, Lefoldt was appointed as Trustee of the Trust and expressly empowered to pursue any and all claims, demands and causes of action transferred from COPsync, as debtor-in-possession, to the Trust. Among the claims and causes of action assigned and transferred to the Trust were any and all claims against Directors and Officers of the Company, defined as "D&O Claims" under the Plan, including any such claims for any breaches of fiduciary duty. *See* Plan, at 6; § 5.19(iv)(a). In his role as Trustee, Lefoldt has received custody and control of certain of the Company's files which existed at the time of the effective date of the Plan. The Company's historic files are in disarray, having been haphazardly packed for transport from Texas to New Orleans in mid-2017 following termination of the vast majority of the Company's employees. The allegations presented in this Complaint have been developed from review of these files and interviews with Company personnel. It is anticipated that, as the Trustee obtains access to additional Company files, additional allegations and claims may be presented, and the current allegations and claims will be further refined.

19.     Defendant Ronald A. Woessner ("Woessner") is an individual of the age of majority and a resident of Texas. From October 2010 until March 2017, Woessner served as the

1470203v.1

Chief Executive Officer and Corporate Secretary of the Company. At all relevant times until June 2017, Woessner served as a Director on the Board of Directors (the "Board") of the Company. Woessner is married to Defendant Kirk.

20. Defendant Alyssa Kirk ("Kirk") is an individual of the age of majority and a resident of Texas. From March 2015 until March 2017, Kirk acted as Chief Operating Officer of the Company.

21. Defendant Joseph R. Alosa, Sr. ("Alosa") is an individual of the age of majority and a resident of New Hampshire. Alosa served as a Director on the Board of the Company beginning in June 2011 and was elected Chairman of the Board of the Company in September 2015.

22. Defendant J. Shane Rapp ("Rapp") is an individual of the age of majority and a resident of Texas. At all relevant times, Rapp served as President of the Company. Rapp also served as a Director on the Board of the Company until August 2016.

23. Defendant Joel Hochberg ("Hochberg") is an individual of the age of majority and a resident of Florida. Hochberg served as a Director on the Board of the Company from October 2009 until January 2017.

24. Defendant Russell D. Chaney ("Chaney") is an individual of the age of majority and a resident of Texas. At all relevant times, Chaney served as a Director on the Board of the Company; he resigned from that position on January 1, 2018.

25. Defendant Robert L. Harris ("Harris") is an individual of the age of majority and a resident of Texas. Harris served as a Director on the Board of the Company from November 2012 until August 2016.

1470203v.1

26.     Defendant Brian K. Tuskan ("Tuskan") is an individual of the age of majority and a resident of Texas.  Tuskan served as a Director on the Board of the Company from June 2015 until August 2016.

27.     Defendant Ward Leber ("Leber") is an individual of the age of majority and a resident of California.  Leber served as a Director on the Board of the Company from October 2016 until March 2017.

28.     Defendant Brad Powers ("Powers") is an individual of the age of majority and a resident of New York.  Powers served as a Director on the Board of the Company from October 2016 until June 2017.

29.     Defendant Luisa Ingargiola ("Ingargiola") is an individual of the age of majority and a resident of Florida.  Ingargiola served as a Director on the Board of the Company from February 2016 until March 2017.

30.     Defendant Barry W. Wilson ("Wilson") is an individual of the age of majority and a resident of Texas.  From November 2010 until January 2017, Wilson served as the Chief Financial Officer of the Company; starting in January, 2017, he served as Chief Accounting Officer of the Company.

31.     Defendant Phillip Anderson ("Anderson") is an individual of the age of majority and a resident of New York.  From January 2017 until June 2017, Anderson served as the Chief Financial Officer of the Company.

32.     Woessner, Kirk, Alosa, Rapp, Hochberg, Chaney, Harris, Tuskan, Leber, Powers, Ingargiola, and Wilson are collectively referred to as the "Defendants."  Woessner, Kirk, Rapp, and Wilson are collectively referred to as the "Officer Defendants" and Alosa, Hochberg, Chaney,

Harris, Tuskan, Leber, Powers, and Ingargiola are collectively referred to as the "Director Defendants." Anderson is not included in any collective definition.

33.     Defendant, Federal Insurance Company ("FIC"), is an insurance company and the issuer of Policy No. 8221-5051 to COPsync for the policy period of December 18, 2015 to December 18, 2016, a Chubb policy providing insurance coverage to the officers and directors of COPsync (the "FIC Policy"). FIC is incorporated under the laws of Indiana, its domicile is Indianapolis, Indiana, and its principal place of business is Whitehouse Station, New Jersey. FIC is registered with the Louisiana Department of Insurance.

34.     Defendant, Berkley Insurance Company ("Berkley"), is an insurance company and the issuer of Policy No. 18018764 to COPsync for the police period of December 18, 2015 to December 18, 2016, a director and officers insurance policy providing coverage to the officers and directors of COPsync (the "Berkley Policy"). Berkley's principal place of business is Greenwich, Connecticut. Berkley is registered with the Louisiana Department of Insurance.

35.     Defendant, XL Specialty Insurance Company ("XL"), is an insurance company and the issuer of Policy No. ELU1447983-16 to COPsync for the policy period of December 18, 2016 to December 18, 2017, a director and officers insurance policy providing coverage to the officers and directors of COPsync (the "XL Policy"). XL's principal place of business is Stamford, Connecticut. XL is registered with the Louisiana Department of Insurance.

36.     Defendant, HCC Specialty Insurance Company ("HCC"), is an insurance company and the issuer of Policy No. 14-SMG-16-A5513 to COPsync for the policy period of December 18, 2016 to December 18, 2017, a director and officers insurance policy providing coverage to the officers and directors of COPsync (the "HCC Policy"). HCC was incorporated in Oklahoma City,

Oklahoma and is domiciled in Houston, Texas. HCC is not registered with the Louisiana Department of Insurance.

## FACTUAL ALLEGATIONS

### COPsync's products

37.     COPsync was created in 2005 as a "software as a service" or "SaaS" platform to allow real-time information sharing by law enforcement agencies and other public safety agencies and departments. The Company served its first customer in 2008, expanded to 100 customers by July 2010, and as of the Petition Date, served over 2,000 customers, including state, county, and local law enforcement departments, schools, and private sector companies. The Company's principal place of business was Addison, Texas, until it relocated to New Orleans in 2017.

38.     Traditionally, law enforcement agencies have operated in self-contained, proprietary communication "silos" that do not easily permit inter-agency communication. The inability of officers to communicate between agencies presents safety concerns for officers and the public and hinders officers' capabilities to respond to and resolve crimes in progress. COPsync was founded by Rapp and Chaney to permit real-time communication between agencies. COPsync's flagship product, the COPsync Network, was a software package that permitted "law enforcement officers to compile and share information, in real time, via a common database accessible by all such officers."

39.     The Company launched the COPsync Network in mid-2008 and the Company generated its first revenues in the fourth quarter of 2008. In addition to its COPsync Network, the Company also developed several complementary products that were all designed to facilitate inter-agency communication.

40.     The Company promoted the COPsync 911 Threat Alert System ("COPsync 911") for use in schools, hospitals, government buildings, and other high-security facilities. The

Company represented that COPsync 911 would allow personnel at a subscribing facility to "instantly and silently send emergency alerts directly to the closest law enforcement officers in their patrol vehicles and to the local 911 dispatch center."  Simultaneously, a text message alert would be sent to all law enforcement officers and personnel in the area.  Once the alert was sent, COPsync 911 would open a "crisis communication portal" allowing direct, real-time communication between the person sending the alert, responding officers, and the 911 dispatch center.

41.     The Company promoted the COURTsync System ("COURTsync") to "enhance courthouse protection and efficiency."  The Company represented that COURTsync allowed court personnel to transmit information regarding certain outstanding warrants to patrol officers, allowing those patrol officers to collect the outstanding warrant fees for the court.  The Company also advertised COURTsync as allowing "court personnel to instantly send emergency alerts directly to the closest law enforcement officers in their patrol vehicles and to the local 911 dispatch center."

42.     The Company described its final product, VidTac In-Vehicle Video System ("VidTac"), as a "100% digital, high-performance, software-driven video system," to serve as a "dashboard camera" system for law enforcement officers.  The Company represented that VidTac to be a lower cost, higher quality alternative to the "hardware centric DVR-based systems" traditionally used by law enforcement agencies.

43.     COPsync's inventory of products were all directed at solving significant existing issues and needs within the law enforcement market and, with the exception of VidTac, offered in a virtually competition-free marketplace.   Although COPsync's products had great promise, the products also suffered from significant technical limitations and issues.

10

44.    COPsync sale representatives convinced numerous customers to acquire software and subscribe to COPsync's services based on improvements in performance that were supposedly under development and would be implemented shortly after purchase.  COPsync consistently failed to allocate sufficient resources to ensure that the promised performance could be delivered in a timely fashion, if at all.

45.    For example, the Company offered COPsync 911 as a school safety system which would inform both the school district as well as local law enforcement in the event that an alarm was triggered at a school facility.  Despite years of promises, COPsync 911 never achieved that functionality.  Not only would the relevant authorities not be notified in the event an alarm was triggered, the software would intermittently issue false alarms.  Rather than serve as a valuable tool for school safety, at least one customer identified COPsync 911 as an impediment to ensuring school safety.

46.    The disparity between the functionality promised to COPsync's customers and what the Company's underfunded development team could deliver was so large that at least one customer instituted litigation alleging that they had been defrauded by the Company, Woessner, and Rapp.

47.    The Officer and Director Defendants knew or certainly should have known that COPsync's products were being sold based on misrepresentations about both the functionality and reliability of existing models and the additional features and products that were supposedly in development.

48.    For example, although the Company promised that the COPsync Network could allow law enforcement agencies using self-contained, proprietary communication solutions to communicate readily with one other, it fell well short of satisfying that promise.  The COPsync

11

Network had significant problems integrating with customer's existing systems. According to some disgruntled clients, those integration issues rendered the product essentially useless.

49.    COPsync also received constant complaints about flaws in VidTac, including an inability to upload videos from vehicles to servers, microphones which would only record intermittently, problems logging into the system, loss of data, and other systemic issues. By May 2013, the Company knew that the VidTac system was "failing in the market place and [wa]s quickly being recognized as a product to stay away from!" Those problems were intractable, and COPsync's development team complained that they lacked resources to be able to fix the software.

### COPsync hires Woessner as CEO

50.    From 2008 through 2010, Rapp and Chaney oversaw the expansion of the Company. In 2010, they decided to focus their efforts on selling COPsync's software, without the burden of managing COPsync's day-to-day operations.

51.    Woessner was hired to replace Chaney as Chief Executive Officer in October 2010. Shortly thereafter, Woessner hired Wilson to serve as Chief Financial Officer. Although Chaney would remain a member of the Board and an employee of the Company, he no longer served as part of the executive team.

52.    Woessner and Wilson had a history of working together. The two had previously worked together at Zix Corporation ("Zix"), a publicly traded company where Wilson was Chief Financial Officer and Woessner served as General Counsel.

53.    Woessner had no prior experience as a chief executive officer. His tenure at Zix was tainted by scandal and litigation regarding allegations of securities fraud. According to the allegations in a derivative class action against Zix and Woessner, among others, Woessner sold virtually all of his stock while the company disseminated false information to inflate its stock

price.[1]  Woessner allegedly reaped almost $1 million in gross profits from the sale of his Zix stock. Although Woessner maintained he did nothing wrong, the litigation settled for more than $5.6 million.

### Woessner's Plan To "Up-list" the Company to NASDAQ Through a Public Offering

54.     After replacing Chaney as Chief Executive Officer of COPsync, Woessner determined that the Company could not access sufficient levels of capital while it traded over the counter on the "pink sheets."  Furthermore, Woessner recognized that COPsync's status as a penny stock limited the opportunities to reward employees and officers through options or other grants of Company stock.

55.     Woessner decided to simultaneously "up-list" the Company's stock to the NASDAQ stock exchange and to close a second public offering to infuse significant capital into the Company, broaden the market for the Company's shares, and allow the Company to meet NASDAQ's listing requirements going forward.

56.     In March 2015, Woessner installed his wife, Alyssa Kirk, to serve as the Company's Chief Operating Officer.  Although COPsync did not have a formal anti-nepotism policy, Woessner and Kirk went to great lengths to conceal their marital relationship from the Company's employees and Board.  Woessner assumed sole responsibility for every aspect of Kirk's employment.  He alone would oversee her performance and approve her expenditure of corporate funds.

57.     Prior to Kirk's employment, the Company had suffered nearly two years of declining sales.  With Woessner's blessing, Kirk undertook to do whatever it took to boost the

---

[1] *See Brody v. Zix Corp., et al.*, Case No. 3:04-CV-1931-K, United States District Court, Northern District of Texas, Dallas Division.

Company's lagging sales so that the NASDAQ up-listing could occur and the Company could complete its planned $10.6 million public offering (the "Public Offering"). That offering price represents a valuation of COPsync in excess of $25 million.

58.     Kirk focused on improving the Company's sales order bookings, a figure which was not audited, but presented in all of the Company's public financial disclosures. Upon information and belief, she began including not only completed, but also preliminary sales orders, in the Company's sales order bookings.

59.     Almost immediately after Kirk's hiring, the Company began recording significant increases in sales bookings. In just one quarter of work, Kirk increased the Company's recorded sales order bookings by 222%. In the third quarter of 2015 and the last quarter prior to the Public Offering, the Company recorded $1.74 million in sales order bookings, the highest level of recorded sales order bookings in more than two years.

60.     The sales order bookings are not audited nor otherwise independently confirmed. Nonetheless, those sales order bookings were included in the prospectus for the Public Offering. With the completion of the Public Offering on November 18, 2015, more than $9.5 million was deposited into the Company's bank account. Contemporaneously, COPsync completed its up-list to NASDAQ.

**COPsync Wastes the Funds Received from the Public Offering**

61.     Following the Public Offering, the Company finally had the funds to invest in the work necessary to resolve the technical issues that marred its products. Rather than use those resources to fix the technical issues with COPsync's products, however, Defendants Woessner, Kirk, Rapp, Powers, and Leber squandered the raised capital through gross waste and mismanagement, self-dealing, and stock manipulation. The remaining Defendants either failed to

14

detect or turned a blind eye to those misdeeds.  In just a few short months, the Company had been

so mismanaged that it was insolvent and in danger of being de-listed from NASDAQ.

62.     Based on COPsync's historical expenses, the $9.5 million cash infusion from the

Public Offering should have funded an additional two and a half years of operations.  Instead, the

Officer Defendants wasted those funds, and millions more, in a mere ten months.  As of September

30, 2016, COPsync's cash on hand was reduced to less than $400,000.  Through a combination of

ineptitude, indifference, self-dealing, and greed, the Officer Defendants drove COPsync to the

brink of bankruptcy.

63.     In the ten months following the Public Offering, the Officer Defendants recklessly

increased COPsync's spending to unsustainable levels.  They pursued spending binge with no

rational plan in place to increase revenues, fix longstanding technical issues in COPsync's

products, or otherwise raise additional funds to maintain their high levels of spending.  During

those ten months, the Officer Defendants increased expenditures from a little over $400,000 per

month to an eye-popping $1 million per month while revenues remained flat.

64.     Despite the ongoing technical issues which undercut the Company's ability to sell

its products and retain customers, the Officer Defendants allocated virtually none of the funds from

the Public Offering to remedying the technical issues.  Their refusal to invest in COPsync's

products rendered the Company unable to stem the tide of customer complaints that the products

that COPsync sold did not have the promised functionality and that the software that was delivered

had, as one customer wrote, "too many glitches" to be useable.

65.     Although COPsync's customers provided the Company with ample opportunity to

deliver what was promised, COPsync simply could not do so.  Various customers terminated their

relationship with the Company because "COPsync was never able to uphold its end of the bargain" and deliver functional software.

66.     Even in light of the customer cancellations due to those technical deficiencies, the Officer Defendants refused to expend additional resources to resolve the long-standing problems to ensure COPsync had marketable and functional products.  Instead, the Officer Defendants recklessly and irrationally doubled the Company's administrative expenses and tripled sales and marketing expenditures.

67.     With approval from the Director Defendants, Woessner, Wilson, and Rapp spent much of the funds received from the Public Offering on significant raises and generous bonuses for themselves.  Following the closing of the Public Offering, Woessner's annual salary increased by nearly 40% to $250,000 and he received an additional $250,000 discretionary cash bonus. Significant raises were also doled out to Wilson (21%) and Rapp (31%).  Wilson, Chaney, and Rapp also received a total of $130,000 in discretionary cash bonuses.

68.     The Officer Defendants further wasted corporate assets by entering into a number of generous, no-strings-attached consulting contracts.  Those consulting contracts obligated the Company to make monthly payments of tens of thousands of dollars but failed to identify the services the individual consultant was to provide, required no deliverable work product, and provided no methodology for evaluating the consultant's performance.

69.     The consulting agreements typically executed by the Company consisted of four pages, the vast majority of which contains boilerplate language and various provisions pertaining to confidentiality of Company information and work product.  The consulting services to be provided are described in Section 1.1.  That Section, entitled "Services," simply states "COPsync hereby engages Consultant to perform mutually agreed services."  No further description of the

16

services the consultant is required to perform is included in the balance of the contract or an addendum thereto. Section 1.2, entitled "Supervision and Reports," states "The Services are to be performed solely by Consultant. Consultant's activates hereunder are to be monitored by Brandon Steele, the Company's Director of Special Projects or his designee." There is no mention of any deliverable work product or service, no objective performance metrics, and no clearly defined oversight regime.

70.     Not surprisingly, the Company received no discernable benefit for those generous monthly consulting payments. By January 2016, the Officer Defendants caused the Company to enter into dozens of contracts with consultants with monthly fees approaching $250,000, roughly 63% of all pre-Public Offering monthly expenditures.

71.     As a result of the Company's reckless spending at the hands of the Defendants, less than a year removed from the $10 million cash infusion from the Public Offering, the Company was forced to borrow significant funds to meet ongoing operating expenditures. Even when faced with those stark realities, no Defendant undertook any serious efforts to reduce the Company's spending. By early 2017, the Company was routinely unable to meet its payroll obligations, cover its share of employee benefit costs, or make payments to its crucial suppliers.

72.     In addition to an inability to pay its obligations as they became due, the Officer Defendants' gross mismanagement of the Company's cash and the Director Defendants' failure to appropriately monitor the Company's finances had other far-reaching consequences that threatened COPsync's listing on NASDAQ and its ability to meet its obligations to the Securities Exchange Commission (the "SEC") and remain a publicly traded company.

73.     The NASDAQ stock exchange has minimum financial and corporate governance benchmarks for a company to be eligible to be included on and traded through the exchange. One

such listing requirement was maintaining a minimum shareholders' equity balance of at least $2.5 million.  In December 2015, shortly after the Public Offering, the influx of cash had raised the shareholders equity to more than $3.7 million.  The reckless spending by the Officer Defendants was accompanied by corresponding drop in shareholders' equity.  By March 31, 2016—four months after the Public Offering closed—the Company's shareholder equity had fallen to $1.9 million, well under the $2.5 million required by NASDAQ.  On May 20, 2016, NASDAQ informed the Company that it was in danger of being de-listed for its failure to maintain sufficient shareholder equity.  While COPsync successfully delayed NASDAQ from taking action for almost one year, the Company's shareholders' equity balance never recovered.  COPsync was suspended from trading on the NASDAQ on April 6, 2017 and de-listed from the NASDAQ on July 20, 2017.

74.     The consequences of the Officer Defendants' excessive spending and the Director Defendants' failure to exercise appropriate oversight also jeopardized the Company's very status as a publicly traded company.  Federal securities law requires public companies to file certain disclosures with the SEC.  One such filing, the Form 10-K, is an annual report that provides a comprehensive overview of a company's business and financial condition.  The Form 10-K must include audited financial statements.  Failure to file the necessary disclosures with the SEC can result in fines and revocation of a company's registration with the SEC, which terminates all public trading of a company's stock.

75.     By late 2016/early 2017, the Company's cash situation had become so dire that it could not afford to pay its independent auditors to conduct an audit of its 2016 year-end financial statements.  Without payment, the Company's independent auditors resigned, and the 2016 financial statements were not audited.  Without audited financial statements, the Company's 10-K

for 2016 could not be filed.  The Company would not file another required quarterly or annual financial disclosure prior to revocation of its registration on July 23, 2018.

76.     The Company's loss of an independent auditor further hampered the Director Defendants' abilities to obtain objective information regarding the Company's financial status and internal controls.  That a publicly traded company found itself with no independent auditor and no audited financial statements should have been an alarming development for each of the Defendants, individually and collectively.

77.     Plainly, the Director Defendants never implemented any system to monitor the Company's cash expenditures nor to insure that the massive outflow of cash provided any measurable benefit to the Company.  As a result, the Officer Defendants were free to loot much of the Company's cash for their personal benefit and squander the balance on consulting agreements and other expenses which did not benefit COPsync.

78.     Defendants' gross mismanagement left the once-promising Company in an unsalvageable position, forcing it into bankruptcy in late-2017 with a mere $53,000 cash on hand and owing more than $17 million in outstanding claims.

### COPsync Management Misappropriated Corporate Assets

79.     Defendants' gross mismanagement and waste were not the only culprits for pushing COPsync into insolvency.  Defendants Woessner, Kirk, Powers, and Leber also engaged in the wholesale looting of the Company's assets for their own enrichment while the remaining Defendants permitted the looting to occur by failing to prevent it or by abdicating oversight and ignoring the diversion of Company assets.

80.     After the Public Offering, the Officer Defendants began charging the Company for their own daily living expenses.  Upon information and belief, Defendants Kirk and Rapp charged

the Company thousands of dollars every month for the bank notes and insurance payments for their personal vehicles. Woessner secured a long-term leases on a luxury apartments in Texas and New York City for personal use which were paid for by the Company and submitted expenses for personal travel.

81.     To ensure they could continue living off the Company's rapidly depleting funds, Woessner and Kirk needed a subservient and loyal majority on the Board of Directors. Woessner sought the appointment of two new purportedly independent directors, Brad Powers and Ward Leber. Once Powers and Leber were installed on the Board, Woessner bought the new purportedly independent directors' loyalty by rewarding them with generous consulting contracts that entitled them to significant monthly payments, well above and beyond the Board fees which they were already paid. Upon information and belief, these contracts were never approved by the full Board. In addition to the monthly consulting payments, Powers' and Leber's consulting contracts entitled them to reimbursement of expenses, a benefit they took full advantage of, submitting tens of thousands of unsubstantiated expenses for reimbursement.

82.     Despite his Board fees, consulting fees, and significant unsubstantiated expense reimbursements, Powers was still not satisfied with what he could extract from the Company. To mollify his "independent" director, Woessner authorized Powers to have direct and unfettered access to the Company's operating bank account. Once Powers secured that access, he routinely drew significant sums directly from the Company's operating account for his personal use. Between October 2016 and June 2017, Powers withdrew hundreds of thousands of dollars while the Company struggled to pay its basic obligations so that it could maintain operations. Woessner, Kirk, Wilson, and Anderson were all aware of Powers' misappropriation of Company assets—yet refused to take any action to stop him. The remaining Defendants failed to ensure the Company

20

had adequate controls in place to prevent an outsider director from inappropriately accessing corporate bank accounts.

### COPsync's Management Engages in Stock Manipulation

83.     Recognizing that the Company was nearly drained of all its resources, Woessner implemented a scheme to enrich himself and other corporate insiders in the Company's final days. Woessner led a campaign to use some of the Company's minimal cash reserves to engage in rounds of short-term stock price manipulation to allow insiders to reap one final payday.

84.     Beginning in January 2017, Woessner directed that tens of thousands of dollars of corporate funds be funneled to a "consultant," Garrett Parsons, to churn sales of the Company's stock.  Woessner's actions resulted in temporary, artificially high stock prices which permitted insiders to reap significant profits during a period of rapidly declining stock prices.  The manipulation occurred monthly through March 2017, when Woessner was finally terminated as Chief Executive Officer by the Board.  Despite his ouster as an executive of the Company, Woessner remained on the Board.

### Anderson Fails to Halt Looting and Mismanagement

85.     Anderson was employed as the Company's Chief Financial Officer in January, 2017.  His principal duties included insuring the Company's significantly reduced cash was not wasted and that systems were in place to timely and accurately ensure financial information was available, including, in particular, systems to monitor the use of cash.  He badly failed in the performance of both duties.  The Officer Defendants and Powers continued to spend Company funds and expenses that benefited them personally, but provided no meaningful benefit to the Company.  Financial systems were either never implemented or not effectively employed as the looting and division of Company assets that began after the public offering continued.

**COPsync's Board Abdicated Its Duty to Oversee the Company**

86.     Much of the Officer Defendants' mismanagement, waste, and misappropriation of corporate assets could have been avoided had the Board honored its obligation to oversee management.  The Director Defendants were uninformed, unprepared, and seemingly uninterested in what was happening with the Company.  Indeed, from the time of the public offering forward, the Director Defendants abdicated their duties to supervise the Officer Defendants.

87.     Internal documents reflect a poor history of participation by Board members.  That trend continued as Woessner, Kirk, and others burned through the Company's rapidly dwindling cash reserves.  At one point, attendance at meetings was so low that the Board contemplated imposing financial penalties for Board members that did not appear for meetings.

88.     Attendance issues aside, it appears Board members failed to remain informed as to the Company's finances and operations.  Upon information and belief, the Director Defendants neither received nor requested detailed operational or financial information from the Company.  Without that vital information, Board members could not have possibly been able to meaningfully carry out their fiduciary obligations to the Company.

89.     Woessner capitalized on the Board's uninterested and uninformed nature.  He created a "shadow" Board to further cement his control over the Company.  Woessner did this by holding unofficial Board meetings with only the most loyal Board members, which upon information and belief included Woessner, Powers and other as of yet unidentified board members.  Through those unrecorded secret meetings, he was able to wrest control of the Board's purportedly independent decision-making process and shape it to his purposes.

1470203v.1

90.     Given the fractured, uninformed status of the Board, it is unsurprising that Woessner and Kirk were able to act and spend with impunity for months.  Only when the Company's assets were exhausted did the Board finally decide to perform its oversight role.

91.     The Board engaged the firm of Nason Yeager Gerson White & Lioce, P.A. ("Nason Yeager") in January 2017 to conduct an independent investigation of allegations of impropriety in COPsync's business relationship with one of its customers.  Upon information and belief, preliminary findings from Nason Yeager presented to the Board in conjunction with the poor financial condition of the Company led to the dismissal of Woessner and Kirk as officers of the Company in March 2017.

92.     Unfortunately, by the time the Board finally terminated Woessner and Kirk for their abysmal performance, too much damage had been done.  The Board's efforts to turn COPsync around were unsuccessful and the Company was forced to seek bankruptcy protection in September 2017.

<u>COUNT I</u>
<u>BREACH OF FIDUCIARY DUTY FOR GROSS MISMANAGEMENT</u>
<u>(OFFICER DEFENDANTS)</u>

93.     The Trustee adopts by reference and incorporates all previous allegations in paragraphs 1-92 as if fully set forth herein.

94.     The Officer Defendants owed fiduciary duties of care, good faith, and loyalty to the Company.  At all relevant times, the Officer Defendants should have been vigilant and taken all necessary actions to ensure that the Company was properly managed and corporate assets were not needlessly wasted.  The infusion of $9.5 million from the Public Offering should have been sufficient to fund ongoing operations of the Company for more than two-and-a-half years.  However, due to the Officer Defendants' reckless and irrational spending, all Public Offering funds

23

(and millions more) had been exhausted within ten months of the Public Offering with no benefit to the Company.

95.     To fulfill their fiduciary duties, the Officer Defendants were required to manage the Company's operations and cash expenditures rationally.  Instead, the Officer Defendants breached their duties by, among other things, grossly mismanaging the Company's operations and recklessly expending enormous sums of money with no rational business purpose and for no benefit of the Company.  The Officer Defendants' gross mismanagement of the Company either constituted a series of intentional acts with a purpose other than advancing the best interests of the Company or demonstrated a conscious disregard of the Officer Defendants' duties to the Company.

96.     The loss of such significant sums of cash caused the Company to be unable to meet its ongoing operational expenditures and forced the Company into bankruptcy.  As a result of those breaches of fiduciary duty, the Officer Defendants are liable *in solido* for all damages arising out of these breaches of fiduciary duty and in an amount to be proven at trial.

**COUNT II**
**BREACH OF FIDUCIARY DUTY FOR GROSS MISMANAGEMENT**
**(DIRECTOR DEFENDANTS)**

97.     The Trustee adopts by reference and incorporates all previous allegations in paragraphs 1-96 as if fully set forth herein.

98.     The Director Defendants owed fiduciary duties of care, good faith, and loyalty to the Company.  At all relevant times, the Director Defendants should have been vigilant and taken all necessary actions to ensure that the Company was properly managed and corporate assets were not needlessly wasted.

99.     Each of the Director Defendants had an obligation to oversee the actions of the Officer Defendants to ensure that they managed the Company properly.  In fact, they wholly abdicated their oversight responsibilities.  The Director Defendants were grossly negligent in

24

failing to monitor the Company's operations and cash expenditures. The Director Defendants knew they had a duty to monitor and oversee the Company's operations and cash expenditures. By failing to appropriately oversee the Company's operations and cash expenditures, the Director Defendants acted with conscious disregard for their duties.

100.    The loss of such significant sums of cash caused the Company to be unable to meet its ongoing operational expenditures and forced the Company into bankruptcy. As a result of these breaches of fiduciary duty, the Director Defendants are liable *in solido* for all damages arising out of these breaches of fiduciary duty and in an amount to be proven at trial.

<u>COUNT III</u>
<u>BREACH OF FIDUCIARY DUTY OF LOYALTY</u>
<u>FOR MISAPPROPRIATION OF CORPORATE ASSETS</u>
<u>(OFFICER DEFENDANTS AND ANDERSON)</u>

101.    The Trustee adopts by reference and incorporates all previous allegations in paragraphs 1-100 as if fully set forth herein.

102.    The Officer Defendants and Anderson owed fiduciary duties of care, good faith, and loyalty to the Company. At all relevant times, the Officer Defendants and Anderson should have been vigilant and taken all necessary actions to ensure that the Company's assets were only used for the benefit of the Company and not for the personal benefit of Woessner, Kirk, Powers, or any other officer and/or director.

103.    Woessner, Kirk, Powers, and any other officer and/or director who utilized corporate funds for personal purposes breached their duty of loyalty to the Company. Upon information and belief, the Officer Defendants and Anderson knew or, through the exercise of reasonable diligence, should have known that Woessner, Kirk, and Powers were misappropriating corporate funds for personal purposes and failed to stop the misappropriation. The Officer

Defendants and Anderson knew they had a duty to prevent the misappropriation of the Company's assets and they failed to do so, demonstrating a conscious disregard for their duties.

104.    The misuse of significant sums of cash contributed to the Company being unable to meet its ongoing operational expenditures and caused, or at least greatly hastened, the Company's descent into bankruptcy.  As a result of these breaches of fiduciary duty, the Officer Defendants and Anderson are liable *in solido* for all damages arising out of these breaches of fiduciary duty and in an amount to be proven at trial.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY OF LOYALTY FOR**
**MISAPPROPRIATION OF CORPORATE ASSETS**
**(DIRECTOR DEFENDANTS)**

105.    The Trustee adopts by reference and incorporates all previous allegations in paragraphs 1-104 as if fully set forth herein.

106.    The Director Defendants owed fiduciary duties of care, good faith, and loyalty to the Company.  At all relevant times, the Director Defendants should have been vigilant and taken all necessary actions to ensure that the Company's assets were only used for the benefit of the Company and not for the personal benefit of Woessner, Kirk, Powers, or any other officer and/or director.

107.    Woessner, Rapp, Powers, and any other director who utilized corporate funds for personal purposes breached their duty of loyalty to the Company.  Upon information and belief, the Director Defendants knew or, through the exercise of reasonable diligence, should have known that Woessner, Kirk, Rapp and Powers were misappropriating corporate funds for personal purposes and failed to stop the misappropriation.  The Director Defendants knew they had a duty to ensure the implementation of adequate controls and oversight to prevent the misappropriation

of the Company's assets and they failed to do so, demonstrating a conscious disregard for and abdication of their duties.

108.    As directors, Woessner, Rapp and Powers breached their duty of loyalty by using Company assets for purposes that benefited them personally but provided no benefit to COPsync. The other Director Defendants breached their duty of loyalty by wholly abdicating their responsibility to insure Company assets were not wasted.

109.    The misuse of significant sums of cash contributed to the Company being unable to meet its ongoing operational expenditures and caused, or at least hastened, the Company's descent into bankruptcy.  As a result of these breaches of fiduciary duty, the Director Defendants are liable *in solido* for all damages arising out of these breaches of fiduciary duty and in an amount to be proven at trial.

**COUNT V**
**BREACH OF DUTY OF LOYALTY FOR INSIDER TRADING**
**(WOESSNER AND OTHER UNIDENTIFIED DEFENDANTS)**

110.    The Trustee adopts by reference and incorporates all previous allegations in paragraphs 1-109 as if fully set forth herein.  The Trustee reserve the right to amend this count to assert claims against other Defendants if relevant information is subsequently obtained, including by discovery.

111.    Woessner owed a fiduciary duty of loyalty to the Company.  At all relevant times, Woessner had an obligation to not misuse Company information for personal profit.

112.    Woessner or his agents used corporate funds to manipulate COPsync's stock price in January, February, and March 2017.  The fact that Company funds were being improperly used to inflate COPsync's stock price was material, nonpublic information.

1470203v.1

113.    Woessner knew the particular details of the scheme to manipulate the Company's stock prices, including the date the manipulations would occur.  Upon information and belief, Woessner used this information to sell his shares in the Company at significantly inflated prices.

114.    As a result of this breach of their duty of loyalty to the Company, Woessner is liable for all profits made as a result of the sale of his stock in an amount to be proven at trial.

**COUNT VI**
**DIRECT ACTION**
**(XL, HCC, FIC AND BERKLEY)**

115.    The Trustee adopts by reference and incorporates all previous allegations in paragraphs 1-114 as if fully set forth herein.  The Trustee reserves the right to amend this count to assert claims against other Defendants if relevant information is subsequently obtained, including by discovery.

116.    Louisiana's direct action statute provides, in pertinent part:

> [An] injured person... at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and, such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido, in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Code of Civil Procedure Art. 42 only....

La. Rev. Stat. § 22:1269(B)(l).

117.    Louisiana's direct action statute further provides: "This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana…."  La. Rev. Stat. § 22:1269(b)(2).

118.    The claims set forth herein against the Officer Defendants, Director Defendants, and Anderson are covered claims under those certain insurance policies issued by XL and

HCC. This coverage is not subject to any of the exclusions set forth in the XL and HCC Policies.

119. To the extent any of the claims set forth herein against the Officer Defendants, Director Defendants, and Anderson are not covered claims under the insurance policies issued by XL and HCC, in the alternative, such claims set forth herein against the Officer Defendants, Director Defendants, and Anderson are covered claims under those certain insurance policies issued by FIC and Berkley. This coverage is not subject to any of the exclusions set forth in the FIC and Berkley Policies.

120. The Officer Defendants, Director Defendants, and Anderson are Insured Persons under the FIC Policy, the Berkley Policy, the XL Policy, and the HCC Policy.

121. The claims set forth herein against Officer Defendants, Director Defendants, and Anderson were made during the Policy Period for both the XL and HCC Policies (December 18, 2016 to December 18, 2017).

122. Alternatively, if it is later determined that any or all of the claims against Officer Defendants, Director Defendants, and Anderson were made prior to December 18, 2016 at 12:01 AM Central Time, Plaintiff maintains that the claims set forth herein against Officer Defendants, Director Defendants, and Anderson were made during the Policy Period for both the FIC and Berkley Policies (December 18, 2015 to December 18, 2016).

123. Therefore, XL and HCC are liable jointly and *in solido* with the Officer Defendants, Director Defendants, and Anderson for the breaches of fiduciary duty which injured COPsync.

124. To the extent XL and HCC are found not liable jointly and *in solido*—either in whole or in part—with the Officer Defendants, Director Defendants, and Anderson for the breaches of fiduciary duty which injured COPsync, FIC and Berkley are liable jointly and *in*

29

*solido* with the Officer Defendants, Director Defendants, and Anderson for the breaches of fiduciary duty which injured COPsync.

## JURY DEMAND

125.    The Trustee demands trial by jury for all issues triable to a jury.

**WHEREFORE**, the Trustee prays that, after due proceedings, this Court enter a Judgment awarding compensatory damages in favor of the Trustee and against all Defendants, jointly and *in solido*, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, together with costs, interest, attorney's fees and for such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**FISHMAN HAYGOOD, L.L.P.**

BY:  */s/  Brent B. Barriere*

Brent B. Barriere (La. Bar No. 2818)
Jason Burge (La. Bar No. 30420)
Kathryn J. Johnson (La. Bar No. 36513)
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile:  (504) 586-5250
Email: bbarriere@fishmanhaygood.com
          jburge@fishmanhaygood.com
          kjohnson@fishmanhaygood.com

*COUNSEL FOR H. KENNETH LEFOLDT, JR., IN HIS CAPACITY AS TRUSTEE FOR THE COPSYNC LIQUIDATION TRUST*

1470203v.1